ROBERT M. DANIELS, RESPONDENT, v. JOHN LANGENSAND, DOING BUSINESS AS SOUTH ST. LOUIS DAIRY COMPANY, APPELLANT.—96 S. W. (2d) 111.

St. Louis Court of Appeals.   Opinion filed October 6, 1936.

Motion for Rehearing Overruled October 20, 1936.

*Wm. L. Bohnenkamp* and *W. Paul Mobley* for appellant.

*Louis M. Bohnenkamp* of Counsel.

*Eagleton, Waechter, Yost, Elam & Clark* for respondent.

HOSTETTER, P. J.—This is a suit for damages for personal injuries claimed to have been sustained by plaintiff in a collision between his automobile and a milk wagon drawn by a horse, which was driven by George Ahrens, an employee of the defendant.

The collision occurred between 12:30 and one o'clock on the morning of June 7, 1925, on South Jefferson Avenue some seventy-five or 100 feet south of its intersection with Miami Street, in the city of St. Louis, Missouri, which intersection was controlled by electric traffic signals.

Jefferson Avenue was a brick paved street, running generally in a north and south direction, about sixty feet wide from curb to curb and containing a double set of street car tracks about fifteen feet wide in all located in the center of the street, thus leaving a space of about fifteen feet between the outermost rail on either side and the curb. Miami Street is an east and west street, and Winnebago Street is the next street south of Miami, which also intersects Jefferson Avenue, and the block between these two intersecting streets is about 600 feet long. The next street south of Winnebago is Chippewa, and farther south is Keokuk Street.

Plaintiff's original petition, which was filed on the 9th of September, 1925, charged that he "was run over and against" by the milk wagon and sustained serious and permanent injuries and his machine damaged in the sum of $200 on account of defendant's negligence and asked for $5000 damages.

On May 27, 1927, plaintiff filed an amended petition.

On April 10, 1929, plaintiff filed his second amended petition in which he asked judgment for $15,000 damages. On June 5, 1933, plaintiff amended his second amended petition by interlineation.

On April 11, 1929, a trial was concluded in which the jury returned a verdict for $1250 in favor of plaintiff, which was set aside by the trial court on the ground that it was against the weight of the evidence.

The petition, as finally amended, was substantially as follows:

That on June 7, 1925, plaintiff was driving and operating an automobile northwardly on south Jefferson Avenue, at or near its intersection with Miami Street, and that defendant's agent and servant, driving a horsedrawn milk wagon along said street, suddenly turned said milk wagon to the left, whereby it collided with and struck plaintiff's automobile, thereby injuring him through the negligence of defendant's agent and servant.

Seven specific charges of negligence were set out, viz.:

1. Failure to give signal of the turning;

2. Failure to exercise ordinary care to discover plaintiff's automobile on the street;

3. Failure to stop, slacken speed, turn or swerve so as to avoid the collision;

4. Failure to have the vehicle under control so as to be readily stopped;

5. Failure to observe the humanitarian doctrine;

6. Violation of City Ordinance No. 32926, Section 3, Par. H.;

7. Violation of Section 3, Par. K. of same ordinance.

Defendant's answer consisted of a general denial and a plea of contributory negligence on the part of plaintiff, viz.; (a) the driving of his automobile in excess of twenty-five miles per hour in violation of statute and of city ordinance, thereby creating presumption of negligence; (b) failure to drive automobile as close to right hand side of street in violation of statute and city ordinance; (c) failure to give warning of approach of automobile; (d) violation of humanitarian rule.

Defendant also set up his counterclaim, asking judgment for $100 damages to the milk wagon and $50 damage to the horse, on account of alleged negligence of defendant, catalogued as follows:

1. Excessive speed.

2. Failure to sound horn.

3. Failure to discover horse and milk wagon.

4. Failure to stop, slacken speed, turn or swerve automobile so as to avoid collision.

5. Negligently swerving and turning automobile thereby causing collision.

6. Failure to keep movement of automobile under control.

7. Violation of humanitarian rule.

8. Driving in excess of twenty-five miles an hour for distance of one block, in violation of statute and city ordinance, thereby creating a presumption of negligence.

9. Failing to keep automobile as close to right curb as practical, in violation of statute and city ordinance.

Reply was a general denial of answer and counterclaim.

The cause was tried a second time and concluded on September 21, 1933, and the jury brought in a verdict in favor of plaintiff on his cause of action for $4304.11 and in favor of defendant on his counter claim for $88, which the trial court refused to accept and, after further deliberation, nine jurors brought in a verdict in favor of plaintiff on his cause of action for $3358, and in favor of plaintiff on defendant's counterclaim, upon which a judgment was rendered and, after an unavailing motion for a new trial, an appeal was duly perfected by defendant to this court.

Plaintiff's version of the accident is as follows:

"The accident occurred between 12:30 and 1 in the morning, at Jefferson and Miami. At that time I lived at 3507 Caroline Street. At the time of the accident I was going home from my work. My last stop had been on Broadway, one block south of Itaska, to service an electric sign on a windmill there. I was alone at the time. I was driving my Chevrolet automobile, touring car. I entered Jefferson avenue at Chippewa. Jefferson avenue there has car tracks in the center. It is around fifty or sixty feet wide. I had headlights burning on my car. I saw the milk wagon before the accident, going north in the car track, practically on the northbound car track. At the time I first observed it I was about a block away from it, about Winnebago. At that time I would judge I was going between twenty and twenty-five. I seen the stop sign at the intersection of Miami just about the same time I observed the milk wagon. It had the red light, said 'Stop.' I slackened my speed to about fifteen miles an hour. The stop sign turned and put the green light on, and I put on the gas to go around the milk wagon. The two wheels of my automobile on the right side were in the northbound car track until I got within fifteen or twenty feet of the milk wagon; then I went to turn out to go around him, and just as I did he swerved his horse right in front of me.

"Q. Where was the back end of this wagon with respect to your automobile? A. I guess I was around fifteen or twenty feet behind him.

"Q. You turned to your left, did you? A. Yes, sir.

"Q. About how fast were you going in miles per hour? A. I would judge about twenty miles.

"Q. Did you sound any warning before making that turn? A. I did; I sounded my horn.

"Q. Where were you with respect to the back of the milk wagon at the time you did that? A. I judge twenty feet behind him.

"Q. Will you tell us from there on what occurred, what happened? A. Well, when I seen this horse, that this horse was right in front of me there was only one thing for me to do; that was to run over him or make a turn and get out of the way, so I tried to make the turn.

"Q. How far away from the horse were you when you saw the horse turn westwardly? A. I judge ten feet.

"Q. About ten feet; then, did you swerve your automobile to the left? A. I did.

"Q. Did you make any application of your brakes? A. It is so quick it is hard to tell what happened; a man always will unconsciously apply his brakes.

"Q. Going at twenty miles an hour under the conditions that existed there that evening, with respect to the grade, the kind of pavement and the kind of weather, what is the shortest distance within which you can stop your automobile with reasonable safety to yourself? A. I would say twenty-five to thirty feet.

"Q. The brakes in good condition on your car? A. Yes.

"Q. Was there any collision between you and that wagon? A. Not that I know of.

"Q. Did you collide with anything there? A. I collided with a telephone pole.

"Q. Where was that telephone pole located? A. About eighty feet south of the stop sign.

"Q. The stop sign? Do you mean on Miami street? A. Yes.

"Q. About where was this wagon, with reference to Miami? How far south of Miami street was the wagon about the time the collision occurred? A. Seventy-five or eighty feet, something like that."

No signal or warning was given by arm or otherwise of the turning of the milk wagon.

On cross-examination plaintiff further stated, viz.:

"I drove from Itaska up to Jefferson on Broadway. Broadway and Jefferson come together down there, so that when you are driving north on Broadway you can continue to drive almost directly north when you get to Jefferson. As I drove up Jefferson I don't think there were any automobiles in front of me. To my knowledge there weren't any parked along the east curb of Jefferson. I was driving about twenty or twenty-five miles an hour. I had been driving at that same speed all the time. I judge I was driving with the left-hand wheels in between the rails of the northbound

car track. Jefferson avenue there is paved with brick. When I first saw this milk wagon it was going north, I would judge right close to the street car track or either in it. He could have been straddling one rail the same as I was. He was traveling in exactly the same position as far as the street car track is concerned as I was. I was immediately behind him. I judge it was about a block from my automobile when I first saw it. At that time the milk wagon was going north. I slowed down my speed after that before I reached the milk wagon. I slowed down about ten miles an hour. I was driving between ten and fifteen miles an hour. I judge I drove ten to fifteen miles an hour fifty or a hundred feet, until the stop sign said ''go,'' then I increased my speed. 1 was waiting for the stop sign to change. I began to slow down about the time I crossed Winnebago. The stop sign then said 'stop.' I don't know when it changed to stop. When I first seen it, it said 'stop.' I drove in the same position up to within fifteen feet of the milk wagon. The front end of my automobile was about fifteen feet behind the rear end of the milk wagon at the time I started to pull out to go around the milk wagon. I appreciated the fact when I was quite some distance down the street before I got to within fifteen feet of the milk wagon that I would have to pass it before I got up to Miami street. It was a one-horse wagon. When I turned out to pass the milk wagon I gave myself plenty of room. I might have got into the southbound street car tracks. When the horse began to make the turn to the left I judge I must have been ten or fifteen feet behind it. The horse began to make the turn just about the same time that I began to turn out. I judge I was making twenty or twenty-five miles when I started to go around him. After I had slowed down and traveled over a space at ten or fifteen miles an hour, I speeded up again to about the same speed at which I was driving before I slowed down. The stop sign said 'go' and I increased my speed to go out around the milk wagon. I don't remember hitting the milk wagon at all. I was not disturbed in my seat at all until after my automobile had turned around. It was when the rear end of my automobile hit the curb that I felt any discomfort at all. The right side of the rear end of my automobile hit the curb. I was driving north and the very first time, so far as I know, that my automobile struck anything was after I had made a complete turn and my automobile was going south again; the right side of the rear end smashed up against the curb and telephone pole. It was just making the turn. I tried to go back south again to keep from running over the horse. It was my purpose when I swerved out there to make a complete turn and go south again. That is just exactly what I had in mind doing.

''Q. That is what you had in mind, that you had to do in order to keep from hitting the milk wagon? A. Yes, sir.

"Q. You didn't put on a brake, did you? A. That I couldn't tell you. My brakes were good. Going at 25 miles an hour or at 20 miles an hour I could have stopped my car with safety to myself in twenty-five or thirty feet. Going at 15 miles an hour I could have stopped in about ten feet.

"Q. How close was the front end of your automobile to the rear end of the wagon when you started to make the turn? A. It was just practically right up against it.

"Q. Did you make one turn there or two, Mr. Daniels? A. I turned out to go around, then I made another turn.

"Q. That is, you turned out to go around and you were in the act of turning out to go around the wagon when you first noticed the horse making a turn? A. No, I was just getting ready to go on the left and pass the horse just as he throwed his horse right in front of me; then I couldn't make a swerve big enough for to get out of his way and keep on going. I had to make a complete circle.

"Q. In other words, you couldn't turn your automobile enough to pass between the southbound street car track and the west curb and go on north, but you could make a complete turn and go down south again? A. That is what I tried to do.

"Q. That is what you tried to do. Those street car tracks were about in the middle of Jefferson avenue; were they? A. Yes, sir.

"Q. And about as much room on the one side of the street car tracks as on the other? A. Yes, sir. ·

"Q. Would you say that at the time that you spoke of, at that moment when you made up your mind you would have to turn clear around and go back south again, where was the horse with reference to the street car track? A. Right across it.

"Q. Across which track? A. Both of them.

"Q. The horse wouldn't extent across both tracks? A. The horse and wagon.

"Q. Where was the horse? A. In the southbound track.

"Q. Didn't you notice any movement of the horse at all between the time that you said the left wheels of the wagon were between the two rails of the northbound tracks that is where they were when you started to go out around it and the time the wagon was standing in that position going north? A. Yes, sir.

"Q. And the next time you noticed the horse at all the horse was right directly 'across' the southbound track? A. He turned square in front of me, and I didn't have room enough to get out of his way.

"Q. You didn't see any movement of the horse at all? A. Until he turned him.

"Q. Until the horse was across the southbound track? A. Right in front of me.

"Q. The next time you saw the horse he was standing right in

front of you across the southbound track? A. He wasn't standing; he was walking.

"Q. I say moving? A. Yes, sir.

"Q. That horse was moving all the time? A. That I couldn't tell you.

"Q. You saw him there, wasn't he moving? A. I was behind him, whether he was walking or not I couldn't tell you.

"Q. You don't know that. Were there any automobiles parked along the west curb of Jefferson? A. Not to my knowledge.

"Q. In fact, so far as you know there was no traffic in that street at all except your automobile and the milk wagon; that is right, isn't it? A. Yes, sir.

"Q. When your automobile came to a stop which way was it facing? A. I don't know."

Ed Goeddel, called by plaintiff, testified that he drove northwardly on Jefferson in his automobile following plaintiff's car; that he first noticed plaintiff's machine around Keokuk and Broadway, which was one or two long blocks south of Chippewa; that his (witness') speed was between twenty and twenty-five miles, about the same speed plaintiff as traveling; that he saw the milk wagon turn to the left when plaintiff was coming up to pass it; that he (witness) was about 200 to 250 feet behind the milk wagon when he observed it turning; that the milk wagon was turning and plaintiff was turning before he was ready to pass the milk wagon; that no signal was given by the driver of the milk wagon; that the stop sign was on "stop;" that when he first saw the stop sign on "stop" he was past Winnebago about 200 or 250 feet behind; that he didn't remember hearing plaintiff sound his horn; that he and plaintiff were partners in business, operating a garage under the name of Goeddel and Daniels and lived in the same apartment house and frequently he rode with him, but did not do so that night; that he admitted when he testified in the first trial on April 10, 1929, that when he first saw the milk wagon begin to turn it was over next to the curb on the east side of Jefferson Avenue and was turning out of the gutter and that is what he was saying now; that it (milk wagon) was between the car tracks and the gutter, but closer to the car tracks.

William Niewoehner, companion of Goeddel in the latter's car that night, called by plaintiff, testified in substance as follows:

That he witnessed the accident; that he was unable to state how far Daniels' automobile was from the milk wagon when the latter began to turn; that at the time the collision occurred the stop sign said "go;" that after the collision Daniels went out of the machine and lay down on the sidewalk and the machine went on a telegraph post on the west side of Jefferson, and was wrecked; that the back part of it hit the telegraph post and it had turned all the way

around and was facing south; that he saw no signal from the milk wagon driver when it started to turn; that he didn't notice Daniels' machine before the accident happened; that he and Goeddel had been to a dance and were there but a short time as he didn't dance, and were just riding around.

Wendell Schmidt, witness for defendant, testified in substance as follows:

That he was an employee of defendant and on the night of the accident was a helper on the milk wagon driven by George Ahrens and witnessed the accident which happened on Jefferson Avenue near Miami street in the early morning of June 7, 1925; that driving over Jefferson avenue going north they stopped at Jefferson and Winnebago avenues and he (witness) got off and crossed the street and delivered one stop and stood on the southwest corner of Jefferson and Winnebago waiting for Ahrens to come back after he should serve two customers; that he saw Ahrens turning the horse before plaintiff's machine passed Winnebago; that plaintiff was going at a terrific speed, about forty miles an hour, as he passed him and he kept on going up the car tracks and he heard Ahrens holler, "Hey, watch where you are going," and then heard the crash and he ran up there and found the horse facing a little north of west and the machine was on the west curb facing southeast, the rear right wheel was broken and a spoke there and a man lying on the grass; that the two men in the roadster following plaintiff got there just before he did; that he ran 500 or 600 feet; there was no other traffic; that it was light enough for him to see the milkwagon from where he stood; that the horse went in a slow walk; that no horn sounded as the automobile approached the milk wagon.

No witness on either side supported plaintiff's testimony that he sounded his horn.

John Kraft testified that he managed a soft drink parlor at 3743 South Jefferson and on the evening of June 7, 1925, was standing in front of his place preparatory to locking up and he saw two automobiles pass him traveling at a speed of between forty to forty-five miles an hour; that he watched them go north on Jefferson and noticed no change in their speed, the second car, a roadster, was about a hundred or hundred and fifty feet behind the first; that the second car wanted to catch the first, and that the driver in the first car looked back to see the second machine; that he noticed no change in the direction of the first automobile until he heard the crash; that he went up to the scene of the accident and found the automobile over at the west curb facing south and the milk wagon a little bit east of the northbound tracks, and a man lying on the grass between the curb and the sidewalk.

Albert Lupberger, a city fireman for eleven years, testified as follows:

"In the early morning of June 7th, 1925, I was in the neighborhood of Jefferson avenue and Miami street. I was on the northwest corner of Jefferson in a machine, driving south. My machine was standing; the stop sign was against me. I saw a collision there between an automobile and a milk wagon. This milk wagon was turned facing west, between the two car tracks, kind of turned south already with the horse, and this machine going north at the extreme west of Jefferson avenue, and he spun around in the street and hit this milk wagon on the front wheel, and the horse, throwing the horse and the milk wagon to the east side of the northbound street car tracks. The automobile when it finally stopped was facing southeast in Jefferson avenue, facing east from south on an angle, on the west side of curb, stopped on the west curb. I saw sparks of. fire fly where he slid the horse and wagon. I noticed the automobile after it came to a stop, some of the tires blew out. I saw the automobile just an instant before the collision. At that time the wagon was east and west and the horse was a little south and moving. I heard no horn from the automobile."

The map on the following page is explanatory, and will make the testimony more understandable.

Plaintiff offered and read in evidence Section 3, Paragraph H, of Ordinance No. 32926 of the City of St. Louis, reading as follows:

"(h) Driving into street from alley or private property. No vehicle shall be driven from private property or from an alley onto a street or from the side of the street into a line of moving vehicles, unless the street is sufficiently free from approaching vehicles to permit such vehicles to enter the line of moving vehicles without danger of collision and the operator· or driver of such vehicle shall give warning of his intention to proceed into the line of moving vehicles by sounding his signal device and by giving the signal by the arm required herein for turning to the right or to the left, as the case may be,· and shall then proceed carefully, yielding the right of way in case of doubt to vehicles which are already in motion on the street; and no operator or driver shall drive any vehicle from an alley or private property without first slowing down, giving warning and then proceeding cautiously across the sidewalk so as not to endanger the life or limb of any person."

Defendant objected to the introduction of this portion of said ordinance, on the ground that it had no application to the facts of the case, which objection was overruled.

Plaintiff's only instruction, asked and given by the court, which directed a verdict, is as follows:

"The Court instructs the jury that if you find and believe from the evidence that on the occasion in question plaintiff was driving his automobile over and along Jefferson avenue near its intersection

MIAMI STREET

stop signal at time of accident

stop signal at time of accident

stop signal at time of accident

stop signal at time of accident

approximate place of accident

N.

WINNEBAGO STREET

Schmidt's position at time of accident

Kraft's position at time of accident

W. E.

JEFFERSON AVENUE

CHIPPEWA STREET

KEOKUK STREET

S.

with Miami street in the City of St. Louis, Missouri, and that the defendant, through its driver, was in charge of and operating a milk wagon over and along Jefferson avenue there, and that said milk wagon and the plaintiff's automobile did collide, and that as a direct result thereof, if you so find, the plaintiff was injured thereby; and if you further find and believe from the evidence that at and prior to the time of said collision there was in force and effect in the City of St. Louis, Missouri, Ordinance No. 32926, Section 3, Paragraph H, which was a duly enacted, signed and approved ordinance of the City of St. Louis, Missouri, and if you further find and believe from the evidence that defendants' driver drove and operated the said milk wagon from the side of the street there into a line of moving vehicles at a time when said street there was not sufficiently free from approaching vehicles to permit said milk wagon to enter the line of moving vehicles without danger of collision, if you so find, and that defendant, through his driver, did fail to give warning of his intention to proceed into the line of moving vehicles by giving a signal by the arm for turnng to the left, and did fail to proceed carefully and did fail to yield the right of way to plaintiff's automobile which was already in motion on said street or highway, if you so find, and that said defendant thereby violated the terms and provisions of the foresaid ordinance, if you so find, and if you further find that said collision occurred, and that plaintiff was injured as a direct result of defendant's violation of the aforesaid ordinance (if you find that defendant did violate the terms and provisions of the aforesaid ordinance under the circumstances there) then your verdict must be in favor of the plaintiff and against the defendant.''

We have reached the conclusion that the contention of the defendant, that such portion of the city ordinance embraced in such instruction is inapplicable to the facts of the instant case, is correct and that the judgment based on a violation of same cannot be permitted to stand.

The obvious and primary purpose of that portion of the ordinance is to prevent the driving of vehicles from points outside the street into a line of moving vehicles on the street, and to prevent the driving of a vehicle already on the street from the side of the street into a line of moving vehicles unless it can be done without danger of collision, etc. In other words, the gravamen of the offense of a violator of this portion of said ordinance is in negligently entering into *the line of moving vehicles,* and, by such negligence causing a collision with some one or more of the vehicles in said line of moving vehicles. This applies to one who enters such street from outside same, as well as one who, like defendant, is already a driver along the side of said street. It logically follows that, absent a

line of moving vehicles on the street, no offense can be committed by either class of vehicular drivers under that portion of said ordinance. There was no line of moving vehicles on the street at the time and place of the collision. "One swallow does not make a summer."

The plaintiff at the time of the collision was on the wrong side of the highway, even if he could be properly called a line of moving vehicles. It was shown in evidence that a street car and one or more autos had been halted and were waiting on the north side of the intersection between Miami and Jefferson until the electric signals should change and give the "go" sign, so they could resume their journey south along the west side of Jefferson avenue, but they constituted no part of a line of moving vehicles which defendant could be concerned about.

The said instruction of plaintiff is further erroneous in that it did not require the jury to find that plaintiff was free from contributory negligence, which was pleaded by defendant. There was evidence introduced from which the jury might have found that plaintiff was negligent and that such negligence contributed to the occurrence of the collision. In fact, the first verdict returned by the jury in the instant case, which the trial court properly refused to receive, indicated as much, in that the jury found for the plaintiff on his cause of action, and also found for the defendant on his counterclaim. Thus, in effect, finding that both plaintiff and defendant were negligent.

We do not regard the failure of the defendant's driver of the milk wagon to extend the left hand, as a signal of turning to the left, as an act of negligence of which plaintiff may complain in this cause, because of plaintiff's testimony to the effect that he first saw the milk wagon when he was about a block away and about the same time saw the stop sign at the intersection of Miami street and Jefferson avenue and that it had the red light which meant "stop" and it is patent that he had the opportunity to see the milk wagon in the act of turning and that the extending of the left hand by the driver would have conveyed no more information than his own sense of sight had already conveyed. There was no causal connection between the failure to extend the left hand by defendant's driver and it is not a proximate cause of the collision and consequent injury sustained by plaintiff.

We think it was error for plaintiff's counsel to bring out the fact that defendant had conveyed his business property to his sons. The fact that defendant has ample property to pay off a judgment, or, having ample property has conveyed it away, is not proper to be inquired into by one seeking a judgment for damages, as the ability to pay a prospective judgment or inability to pay

the same furnishes no evidence of negligence necessary for plaintiff to prove, but its sole tendency is to unduly and improperly sway the minds of the jury against defendant. [Scully, Admr. Estate of Dave Stout, dec'd., v. Rolwing, (Mo. App.), 88 S. W. (2d) 394, and cases there cited.]

The motion of plaintiff to dismiss defendant's appeal is overruled.

We deem it unnecessary to discuss the defendant's other assignments of error, but we have concluded to reverse the judgment of the trial court and remand the cause, and, it is so ordered. *Becker* and *McCullen, JJ.,* concur.